### BERTELLOTE *v.* PART OF CARGO OF BRIMSTONE.

*(District Court, D. Maryland.   September 14, 1880.)*

1. CARGO—UNLOADING—CUSTOMS OF PORT.—The owner of a vessel is bound by the customs of a port to which he contracts to carry a cargo, where the charter provides that "the cargo is to be brought alongside the vessel and taken away at the expense and risk of the charterers, according to the use and customs of the place of loading and discharging."

2. CUSTOM OF PORT—UNLOADING CARGO—BRIMSTONE.—The custom of a port to stop discharging cargoes of brimstone when there is a high wind, is not unreasonable.

3. EVIDENCE—CUSTOMARY DISPATCH.—A charter provided "for prompt loading, without loss of time, weather permitting, and customary lay days for discharging." *Held,* under all the circumstances attending the discharge of the cargo, that the vessel had customary dispatch, and a libel for demurrage should be dismissed.

In Admiralty.   Libel for Demurrage.

*Brown & Smith,* for libellant.

*C. N. West,* for respondents.

MORRIS, D. J.   The Italian bark Geromina Madre brought to the port of Baltimore a cargo of over 900 tons of brimstone. She arrived April 24, 1880, commenced discharging on the 27th, and finished May 18th. This libel is filed by the master of the bark, alleging that he was detained in all

21 days, when ten days would have been sufficient, with reasonable dispatch, to have discharged the cargo; and that the detention arose from the fault of the consignees and charterers, for which he should be paid demurrage.

The charter-party provides that "*the cargo is to be brought along-side the vessel and taken away at the expense and risk of the charterers, according to the use and custom of the place of loading and discharging;*" and also provides "*for prompt loading, without loss of time, weather permitting, and customary lay days for discharging.*"

There being no definite number of days stipulated within which the cargo was to be discharged, and it being provided that the charterers were to be entitled to customary lay days, and there being no custom establishing any definite number of days, or rate per day, for discharging, the charterers have performed their obligations, unless detention has ensued from some fault of theirs, or neglect on their part to exercise reasonable diligence, according to the custom of the port. Under such a charter-party the owner of the vessel takes the risk of the weather being suitable, according to the custom of the port, for unloading the cargo, and the charterer takes the risk of being able to provide the proper transportation from the ship's side. *Sprague* v. *West*, 1 Abb. Ad. 548.

The proofs show that the vessel was first ordered to a dock at the Canton wharves, and that there was some delay in getting her to that place, but to this I find that the master consented for the reason that he was saved wharfage. I find that while at the Canton wharf the discharging went on with customary dispatch, and that there was no delay chargeable to the respondents. The proof shows that scows were in readiness to take the portion of the cargo to be discharged into them, and that there was no waiting for them; on the contrary, it would rather appear that the scow men complained that the crew of the bark worked too slowly, and did not give them the brimstone as fast as regular stevedores usually do. I find, also, that the removal of the vessel from the Canton wharf across the harbor, to Locust Point, was by agreement with the master.

It was at Locust Point that the principal detention took place. The libellant alleges that it resulted in great part from the want of a sufficient number of carts, and the constant delays in waiting for them. On this point there is some contradiction of testimony, but I think the preponderance is in favor of the respondents. The principal loss of time arose from the consignee refusing on parts of two days to receive the brimstone, alleging that the weather was too windy, and that so much of the brimstone was blown away in dumping it from the ship into the carts that he was subjected to loss. A further delay was in consequence of disputes, on two days, with the master, with regard to the payment of freight, resulting in his forbidding the discharging to continue until he was paid. Deducting the time lost from these two causes, and the average result per day does not tend to sustain the allegations with regard to the want of carts, contradicted as they are very positively by several intelligent witnesses. The respondents have proved that it is the custom of this port to stop discharging cargoes of brimstone when there is a high wind, as it is a substance liable to be blown away in the handling necessary to unladen it from a ship.

In a charter such as the one in this case the owner of the vessel is bound by the customs of the port to which he contracts to carry the cargo. This custom is proved, and it seems to me not an unreasonable one, although, undoubtedly, it is one likely to lead to disputes and possibly to abuse. The loss entailed on the consignee, which would justify the suspension of the unlading, should not be a trifling one, but should be in some measure commensurate with the usual loss from detention to which the vessels ordinarily bringing such cargoes to the port would be subjected. With regard to the violence of the wind on those days when the discharging was suspended, there is some conflict of testimony, but the testimony on behalf of the respondents is positive, while that of the master of the vessel is not convincing. The libellant, to corroborate his statement, produced the master of another Italian vessel, which was discharging brimstone on the opposite side of the harbor at the same time, and proved by him

that on one of the days on which the respondents refused to receive brimstone on account of the wind the witness continued discharging all day. He says, however, that he did not himself pretend to judge of the force of the wind, and all he can say is that his consignee allowed him to continue discharging.

It appears, moreover, that his vessel lay in a position more sheltered from the wind, being on the north side of the harbor, and the wind being from the north on that day. From his testimony it appears, also, that he was 15 days discharging 550 tons of brimstone, which is a less average than was accomplished by libellant's vessel, which was 20 days, in all, discharging over 900 tons. The United States signal service report was put in evidence by the libellants to show that it was as windy on the days when the greatest number of tons were discharged as on those when the discharging was stopped, but as those reports give only the highest velocity during the 24 hours, they do not show the velocity during the working hours of the day. The report does show that it was what is considered windy weather, and that on the days when the discharging was proceeded with the wind was from the south, and on the days when the discharging was suspended the wind was from the north. At Locust Point the vessel would be sheltered from a south wind and exposed to the north winds.

Upon consideration of the testimony, and of all the circumstances attending the discharging of the cargo, I do not find that the vessel did not have customary dispatch, and the libel must be dismissed.

NOTE.—See *The M. S. Bacon* v. *The Erie & Western Transportation Co. ante*, 344.